*Kimberly J. Ravener*

APPROVED: _____
KIMBERLY J. RAVENER
Assistant United States Attorney

BEFORE:   THE HONORABLE DEBRA FREEMAN
          United States Magistrate Judge
          Southern District of New York

```
- - - - - - - - - - - - - - - - - - x
                                     :    21 MAG 3576
UNITED STATES OF AMERICA             :
                                     :    SEALED AMENDED
         - v. -                      :    COMPLAINT
                                     :
NIAMATULLAH GORGEECH,                :    Violations of
     a/k/a "Naimatullah,"            :    21 U.S.C. §§ 963 & 959;
     a/k/a "Son of Hakeem Jamal      :    18 U.S.C. § 2.
          Khan"                      :
                                     :
              Defendant.             :
- - - - - - - - - - - - - - - - - - x
```

SOUTHERN DISTRICT OF NEW YORK, ss.:

JEREMY N. KIRK, being duly sworn, deposes and says that he is a Special Agent of the Drug Enforcement Administration ("DEA"), and charges as follows:

### COUNT ONE
### (Attempted Narcotics Importation)

1. From at least in or around November 2018, up to and including in or around July 2019, in the Southern District of New York and elsewhere, and in an offense begun and committed outside of the jurisdiction of any particular state or district of the United States, NIAMATULLAH GORGEECH, a/k/a "Naimatullah" a/k/a "Son of Hakeem Jamal Khan," the defendant, who is expected to be first brought to and arrested in the Southern District of New York, knowingly and intentionally attempted to distribute controlled substances, intending, knowing, and having reasonable cause to believe that such substances would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States, from a place outside thereof, in violation of Sections 959(a) and 963 of Title 21, United States Code.

2. The controlled substance involved in the offense was

one kilogram and more of mixtures and substances containing a detectable amount of heroin, in violation of Sections 812, 960(a)(3), and 960(b)(1)(A) of Title 21, United States Code.

(Title 21, United States Code, Sections 963 and 959(d); Title 18, United States Code, Sections 3238 and 2.)

The bases for my knowledge and the foregoing charges are as follows:

3. I have been a DEA Special Agent since 2010. I am currently assigned to the DEA Special Operations Division's Bilateral Investigations Unit, which focuses on international criminal activities. During my time as a DEA Special Agent, I have become familiar with some of the ways in which narcotics traffickers operate, and have participated in numerous investigations involving international drug trafficking. I have been personally involved in the investigation of this matter. This affidavit is based on my communications with other law enforcement officers and other individuals, and on my review of various reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the offenses cited above, it does not include all of the facts that I have learned during the course of the investigation. Where the contents of communications with others and statements by others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## Overview

4. As set forth below, in or around March 2019, NIAMATULLAH GORGEECH, a/k/a "Naimatullah" a/k/a "Son of Hakeem Jamal Khan," the defendant, an Afghanistan-based drug trafficker, attempted to import seven kilograms of heroin into the United States.

5. Between in or around November 2018 and in or around March 2019, NIAMATULLAH GORGEECH, a/k/a "Naimatullah" a/k/a "Son of Hakeem Jamal Khan," the defendant, participated in recorded telephone calls, and exchanged electronic communications[1] with, a

---

[1] All communications referenced in this Complaint were conducted principally in Pashto, which I do not speak. All quotations and summaries in this Complaint drawn from meetings and telephone calls are based on my review of audio recordings and/or preliminary draft transcripts, summaries, and translations, and

DEA confidential source ("CS-1")[2] whom GORGEECH understood to be affiliated with an international drug trafficking organization based in New York City.  During these communications, GORGEECH agreed to provide CS-1 with a multi-kilogram shipment of crystal methamphetamine.  CS-1 stated that he intended to transport the shipment from Afghanistan to another country, and then from that country to the United States.  CS-1 also stated that if his customers in United States liked the first shipment, GORGEECH could expect the customers to order an additional 200 to 300 kilograms.  See infra ¶ 8.

6.   In or around March 2019, NIAMATULLAH GORGEECH, a/k/a "Naimatullah" a/k/a "Son of Hakeem Jamal Khan," the defendant, provided CS-1 with approximately seven kilograms of heroin in Baram Chah, Helmand Province, Afghanistan, with the understanding that those drugs would be transported to and sold in the United States. See infra ¶ 9.  GORGEECH explained that there was a mix up at his laboratory, and that GORGEECH's workers inadvertently prepared heroin instead of crystal methamphetamine, but that GORGEECH decided to proceed with the shipment, because it was too late to prepare an alternative. See id.  CS-1 stated that he could still "use that stuff," because his customers were also interested in purchasing heroin.  Therefore, CS-1 agreed to pay GORGEECH for the heroin.

7.   In or around May 2019, CS-1 arranged to pay NIAMATULLAH GORGEECH, a/k/a "Naimatullah" a/k/a "Son of Hakeem Jamal Khan," the defendant, $35,000 for the heroin. See infra ¶ 10.

### The Investigation

**November 2018-March 2019: GORGEECH Communicates with CS-1 and CS-2 Concerning a Drug Transaction**

8.   Based on my participation in this investigation, conversations with other law enforcement officers involved in this investigation, my review of DEA reports, and my review of

---

are subject to revision upon the completion of finalized transcripts and translations.

[2] CS-1 has been a paid DEA confidential source since approximately November 2017.  The DEA has deemed information provided by CS-1 reliable, and such information has sometimes been corroborated by independent evidence.

draft translations of recordings made by CS-1, I have learned, among other things, the following:

       a.   In or around November 2018, at the DEA's direction, a DEA confidential source ("CS-2")[3] met in person with NIAMATULLAH GORGEECH, a/k/a "Naimatullah" a/k/a "Son of Hakeem Jamal Khan," the defendant.[4]  During this meeting, which was not recorded, GORGEECH stated, in substance and in part, that he wanted to send crystal methamphetamine to the United States. CS-2 responded that he had an associate in the United States who worked with a New York City-based drug trafficking organization — *i.e.*, CS-1. At GORGEECH's request, CS-2 agreed to provide GORGEECH's phone number to CS-1.

       b.   On or about November 19, 2018, at the DEA's direction, CS-1 called GORGEECH at the number that CS-2 had provided.[5]  During that conversation, which was recorded, the following was discussed, in substance and in part:

          i.   CS-1 explained that he was CS-2's "friend," and that CS-2 told him that GORGEECH "has very high-quality goods, that *shisha*." CS-1 stated that he needed "some of that stuff."

          ii.   Based on my conversations with other law enforcement officers who have worked in Southwest Asia, I understand that in the context of narcotics trafficking, "shisha" is a word that translates to "ice" or "crystal," and is commonly used in Southwest Asia to refer to crystal methamphetamine.

---

[3] CS-2 served as an unpaid source of information for the DEA for several years before becoming a paid DEA confidential source in approximately July 2017. The DEA has deemed information provided by CS-2 reliable, and such information has sometimes been corroborated by independent evidence.

[4] CS-2 has known GORGEECH for many years, and has frequently met with GORGEECH in person and spoken with GORGEECH over the phone to discuss narcotics trafficking activities.

[5] CS-2 reviewed this recorded phone call, and confirmed that the voice in the message sounded like the individual with whom CS-2 has met with in person and has spoken to over the phone, and whom CS-2 understands to be GORGEECH.

        iii.    CS-1 further explained to GORGEECH that he needed "high quality stuff," because "we bring that stuff towards New York, America." GORGEECH responded that his "stuff's percentage is number one."

        iv.    CS-1 asked GORGEECH for a sample of four or five kilograms, but GORGEECH stated that he was not willing to provide fewer than "ten counts" — *i.e.*, ten kilograms — because "there are people and I have to pay for the expenses too." GORGEECH stated that he would "make . . . at least ten counts now" as a sample for CS-1's customers, and "[a]fter that, as many orders as you want to place, God willing, I will arrange it for you."

    c.    On or about January 12, 2019, at the DEA's direction, CS-1 spoke by phone with GORGEECH. During that conversation, which was recorded, the following was discussed, in substance and in part:

        i.    GORGEECH stated that his "mechanic" would start to prepare CS-1's sample of "stuffs" – *i.e.*, the crystal methamphetamine sample.

        ii.    CS-1 explained that he planned to transport the "stuff" from Afghanistan to another country, and then from that country to New York, using either a ship or a plane.

    d.    On or about March 4, 2019, at the DEA's direction, CS-1 spoke by phone with GORGEECH. During that conversation, which was recorded, the following was discussed, in substance and in part:

        i.    GORGEECH stated that he had "arranged [CS-1's] stuffs," that is, that the drug sample was prepared and ready to be picked up.

        ii.    CS-1 responded that he was planning to transfer GORGEECH's "stuff" to New York as soon as possible, because the customers were becoming impatient. CS-1 also stated that his customers "may order 200 or 300 counts" – *i.e.*, 200 or 300 kilograms – "very soon."

    e.    On or about March 6, 2019, GORGEECH contacted CS-1 by phone and stated, in substance and in part, that CS-1 could send someone to retrieve the sample from GORGEECH's laboratory in Baram Chah, Helmand Province, Afghanistan (the "Laboratory").

5

**March 2019: The Defendant Provides Heroin for
Importation into the United States**

  9. Based on my participation in this investigation, conversations with other law enforcement officers involved in this investigation, my review of DEA reports, and my review of draft translations of recordings made by CS-1, I have learned, among other things, the following:

    a. On or about March 7, 2019, at the DEA's direction, CS-2 arranged for an individual residing in Afghanistan ("Individual-1") to retrieve the sample from the Laboratory and transport it to Kabul. The sample contained seven packages depicted below (the "Drug Packages"):



    b. On or about April 11, 2019, Individual-1 delivered the Drug Packages to a Foreign Service National working for the DEA in Kabul, Afghanistan.[6] That same day, CS-1

---

[6] Because there were several insurgent attacks in Helmand and Ghazni Province in or around March 2019, Individual-1 was not able to transport the Drug Packages from Baram Chah to Kabul until in or around April 2019.

sent photographs of the Drug Packages, via text message, to NIAMATULLAH GORGEECH, a/k/a "Naimatullah" a/k/a "Son of Hakeem Jamal Khan," the defendant, and then spoke briefly to GORGEECH by phone. During that phone conversation, which was recorded, GORGEECH stated, in substance and in part, "yes, that's my stuff."

      c. The Drug Packages were shipped to a DEA laboratory in the United States. Based on my review of DEA laboratory reports, I have learned that the Drug Packages contained approximately seven kilograms of a powdery substance that tested positive for heroin. As stated above, see supra ¶ 8, GORGEECH had agreed to provide crystal methamphetamine.

      d. On or about April 26, 2019, at the DEA's direction, CS-1 spoke by phone with GORGEECH. During that conversation, which was recorded, the following was discussed, in substance and in part:

          i. GORGEECH explained that there was a mix-up at the Laboratory, and that the Drug Packages provided to CS-1 were intended for another customer. GORGEECH acknowledged that he had realized the mistake, but "decided not to mention anything because it was too late."

          ii. CS-1 stated that he and GORGEECH will "have more business in the future," and that he and his customers "need this stuff too" – i.e., the heroin in the Drug Packages. GORGEECH assured CS-1 that the heroin was "good stuff," because GORGEECH made it for one of his close friends. CS-1 stated that, notwithstanding the mix-up, CS-1 would arrange to pay for the Drug Packages.

### May 2019: The Defendant Receives Payment for the Heroin

    10. Based on my participation in this investigation, conversations with other law enforcement officers involved in this investigation, my review of DEA reports, and my review of draft translations of recordings made by UC-1, I know that:

      a. The price CS-1 and NIAMATULLAH GORGEECH, a/k/a "Naimatullah" a/k/a "Son of Hakeem Jamal Khan," the defendant, agreed to for the Drug Packages was $5,000 per kilogram, for a total of $35,000. To arrange payment, a DEA Undercover Officer

("UC-1") spoke to a narcotics associate of GORGEECH's ("CC-1") by phone. UC-1 explained that the drug trafficking organization of which both UC-1 and CS-1 were a part had money in Australia that they could use to pay the debt to GORGEECH. UC-1 agreed to provide CC-1 with $36,500 to cover the Drug Packages and the cost of transporting the money from Australia to Afghanistan.

      b.   On or about May 23, 2019, an undercover Australian law enforcement agent ("UC-2") met with an individual ("CC-2") in Australia to pay for the heroin that GORGEECH provided in Afghanistan. UC-2 provided CC-2 with AU$53,000 – the approximate equivalent, in Australian dollars, of $36,500.

      c.   On or about May 27, 2019, at the DEA's direction, CS-1 spoke by phone with GORGEECH. During that conversation, which was recorded, the following was discussed, in substance and in part:

          i.   GORGEECH confirmed that he had received the money UC-2 had provided to CC-2 in Australia, which represented payment for the Drug Packages.

          ii.   GORGEECH asked CS-1 if the "seven guests" – *i.e.*, the seven kilograms of heroin in the Drug Packages – had arrived. CS-1 responded that they had "arrived to America's border, close to New York."

      d.   On or about July 8, 2019, at the DEA's direction, CS-1 spoke by phone with GORGEECH. During that conversation, which was recorded, the following was discussed, in substance and in part:

          i.   CS-1 stated that the Drug Packages arrived in New York. CS-1 stated that he gave the "stuff" to his customers, and that "the customers are very happy." GORGEECH responded that he was "very happy that the "stuff" arrived safely, and that CS-1's "friends" liked it.

      e.   CS-1 stated that he was ready for "bigger jobs." GORGEECH responded that he "stopped small jobs a long time ago." CS-1 stated that once CS-1 and GORGEECH met in person, they could make arrangements to "start the jobs." GORGEECH stated that he could arrange "1,000 counts" – *i.e.*, 1,000 kilograms – "with one phone call."

   WHEREFORE, your deponent respectfully requests that a warrant be issued for the arrest of NIAMATULLAH GORGEECH, a/k/a "Naimatullah" a/k/a "Son of Hakeem Jamal Khan," the defendant, and that he be arrested and imprisoned, or bailed, as the case may be.


                              s/Jeremy N. Kirk, by the Court, with permission
                              _____
                              Jeremy N. Kirk
                              Special Agent
                              Drug Enforcement Administration


Sworn to me through the
transmission of this Affidavit
by reliable electronic means (FaceTime),
pursuant to Federal Rule of Criminal
Procedure 4.1,  1st day of April, 2021

_____
THE HONORABLE DEBRA FREEMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK